UNITED STATES DISTRICT COURT
DISTRICT OF MAINE

| | |
|---|---|
| P y P EQUIPOS SOCIEDAD DE RESPONSABILIDAD LIMITADA DE CAPITAL VARIABLE,<br><br>Plaintiff,<br><br>v.<br><br>EMERSON APPARATUS COMPANY,<br><br>Defendant. | Case No. _____ |

## COMPLAINT

Plaintiff P y P Equipos Sociedad de Responsabilidad Limitada de Capital Variable ("Plaintiff" or "PyP"), by its attorneys, brings this Complaint against Defendant Emerson Apparatus Company ("Defendant" or "Emerson").

## PARTIES

1. PyP is a Sociedad de Responsabilidad Limitada de Capital Variable with a principal place of business in the municipality of Ecatepec de Morelos, state of Mexico, nation of Mexico.

2. Emerson Apparatus Company is a Maine corporation with its principal place of business in the Town of Gorham, State of Maine, that purports to manufacture precision laboratory testing equipment for industrial applications. It also claims to manufacture a range of products, "all of which are designed, manufactured, assembled, and supported in our integrated facilities in Gorham, Maine."

## JURISDICTION AND VENUE

3. This action is brought pursuant to 28 U.S.C. §§ 1332, 2201.

4. This Court has personal jurisdiction over Emerson because its principal place of business is in Gorham, Maine.

5. This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1332 because the amount in controversy exceeds Seventy-Five Thousand Dollars ($75,000.00), exclusive of interest and costs, and because the matter is between citizens of different states because PyP is a citizen of Mexico and Emerson is a citizen of Maine.

6. The amount in controversy exceeds $75,000.00 because the value of the product yet to be delivered to PyP, the value of the money paid by PyP to Emerson, and the value of the damage to PyP's business relationships, each exceed $75,000.00.

7. Venue in this judicial district is proper under 28 U.S.C. §§ 1391(b)(1)-(2), 1391(b)(2) and Local Rule 3(h). Specifically, Defendant's principal place of business, where it performed the work giving rise to this Complaint, is located in the Town of Gorham, County of Cumberland, State of Maine.

## FACTS COMMON TO ALL COUNTS

8. On or about June 25, 2024, PyP and Emerson entered a contract (the "Agreement") wherein Emerson would manufacture and ship forty-one (41) total pieces of equipment, as follows: 7 Crush Tester 1210; 10 Pneumatic Cutters; 9 PAT accessories; 9 RCT accessories; 4 BCT 7200; and 2 BCT 8510. A true and accurate copy of the email exchange by which the parties entered the Agreement is attached hereto as Exhibit 1.

9. PyP ordered this equipment from Emerson to fulfill a contract between PyP and an unrelated business entity, Smurfit Westrock plc ("Smurfit"). The equipment is manufactured to aid in the design, testing, and production of various types of cardboard packaging.

10. The payment terms of the contract, confirmed via email and purchase order to Emerson on June 25, 2024, stated that 30 percent of the total contract price was due at the time of placement of the order, 30 percent was due at the time of final delivery of the equipment, and 40

percent was due NET 60 days. A true and accurate copy of this purchase order is attached hereto as <u>Exhibit 2</u>.

11. The total contract price was $492,918.40 USD.

12. The timeline for shipment of the equipment ranged from 10-12 weeks for the BCT 7200s to 16-18 weeks for the BCT 8510s. A true and accurate copy of the email reflecting this timeline is attached hereto as <u>Exhibit 3</u>. This email exchange also reflected Emerson's understanding that time was of the essence in this Agreement.

13. Plaintiff made the first payment on or about June 25, 2024, in the amount of $148,000 USD, which was the equivalent of 30 percent of the total contract price.

14. On or about August 14, 2024, seven weeks after the order had been placed and having received no meaningful update on its progress, PyP inquired as to the status of the order.

15. On or about August 14, 2024, Emerson responded that they were not in control of the delivery dates and thus it would be impossible to provide concrete delivery dates. A true and accurate copy of this email is attached hereto as <u>Exhibit 4</u>.

16. In response, on or about August 23, 2024, Emerson told PyP that assembly on all Crush Tester 1210s would be completed in approximately two weeks and other equipment would be ready within two to three weeks.

17. On or about October 18, 2024, Emerson acknowledged that they had agreed to the above payment terms but requested that PyP make a payment installment early and cited cash flow issues as the reason for delays in the production of the equipment. A true and accurate copy of this email is attached hereto as <u>Exhibit 5</u>.

18. Emerson went on to offer a 10 percent discount in exchange for PyP agreeing to make payments before they were due under the terms of the original Agreement, which would be

deducted from the final payment installment and Emerson stated that this advance payment was necessary before it could ship any equipment.

19. On or about November 20, 2024, Smurfit Westrock reached out to PyP to express dissatisfaction by the delays and threatened to cancel the order and initiate penalties if the equipment was not delivered by December 31, 2024.

20. On or about December 2, 2024, Emerson told PyP that the equipment would not be released until the second payment is received, in direct violation of the terms of the Agreement.

21. On or about December 4, 2024, Emerson sent an email to PyP demanding payment before the equipment could be shipped and threatening to notify Smurfit Westrock that the equipment was being withheld until payment was made. A true and accurate copy of this email is attached hereto as <u>Exhibit 6</u>.

22. In the same December 4, 2024, email, Emerson threatened to send equipment to other customers if it did not receive payment from PyP, despite the next payment installment being due upon final delivery according to the terms of the Agreement.

23. Due to Emerson's threats and unjustified demands, Plaintiff made a second payment in the amount of $100,000 USD on or about December 13, 2024.

24. On or about December 19, 2024, nearly six months after the initial order was placed, Emerson made the first shipment of the equipment.

25. Plaintiff made a third payment in the amount of $25,000 USD on or about February 27, 2025.

26. On or about February 28, 2025, Emerson again threatened not to release the equipment for shipment until another payment was received.

27. Plaintiff made a fourth payment in the amount of $38,888.75 USD on or about March 10, 2025.

28. On or about April 8, 2025, Emerson sent a letter to both PyP and Smurfit Westrock, changing its explanation regarding the delays from cash flow issues to manufacturing issues. A true and accurate copy of this email and letter is attached hereto as Exhibit 7. Whereas Emerson had previously claimed that its cash flow problems were the cause of the delays in the delivery of the equipment, *see* Ex. 5, Emerson changed its tune in the letter to Smurfit Westrock, claiming that manufacturing issues were the cause of the delay.

29. This representation about manufacturing problems to Smurfit Westrock clearly contradicts the representations about cash flow issues that Emerson made to PyP in an effort to induce PyP to make advanced payments.

30. On April 11, 2025, Emerson notified PyP that it was breaching the terms of the Agreement and demanded payment in full before any equipment would be shipped.

31. On or about May 15, 2025, Emerson sent PyP a false invoice which omitted previous payments and claimed a balance due of $244,958.40 USD.

32. On or about May 25, 2025, Emerson sent PyP a delivery schedule for the remaining equipment that indicated a final delivery date of June 27, 2025.

33. On or about May 29, 2025, PyP requested that Emerson honor the ten percent discount that it promised in exchange for Plaintiff's early payment, as set forth in paragraph 18 *supra*. *See also* Ex. 5.

34. On or about May 29, 2025, Emerson responded that it would not honor the previously promised discount, despite Plaintiff's completed performance and offered no justification for its position. A true and accurate copy of this email is attached hereto as Exhibit 8.

35. On June 11, 2025, Emerson admitted to omitting PyP's third and fourth payments, a total of $63,888.75 USD, from the previous invoice.

36. On or about June 17, 2025, Emerson told PyP that it would not release completed equipment or continue production of other equipment until more payments had been made.

37. Plaintiff made a fifth payment in the amount of $20,000 USD on or about June 18, 2025.

38. Plaintiff also made a sixth payment in the amount of $20,000 USD on or about June 18, 2025.

39. Plaintiff made a seventh payment in the amount of $25,000 USD on or about July 9, 2025.

40. On or about August 19, 2025, Emerson again threatened to contact Smurfit Westrock directly if PyP did not pay in full—and in violation of the Agreement—for all equipment before shipment could be released. A true and accurate copy of this email is attached hereto as Exhibit 9.

41. On or about August 28, 2025, Emerson again provided an invoice in which it refused to honor the previously promised discount in exchange for a change in payment terms and demanded $109,161.90 USD in full payment before it would ship the remaining equipment. A true and accurate copy of this email is attached hereto as Exhibit 10.

42. Despite breaching the terms of its Agreement with PyP, its fraudulent material misrepresentations, its negligent misrepresentations, and its interference with PyP's contract and business with Smurfit Westrock, Emerson continues to demand payments in violation of the contract terms to continue equipment production.

## COUNT I
### BREACH OF CONTRACT

43. PyP repeats and realleges the allegations contained in paragraphs 1 through 42 above as if fully set forth herein.

44. PyP and Defendant agreed to contract terms which included payment in three installments; 30% of the total contract price was due at the time of placement of the order, 30% was due at the time of final delivery of the equipment, and 40% was due net 60 days.

45. Defendant unilaterally altered those terms and breached the contract when it demanded payment in full before it would ship the equipment. Defendant also promised a 10 percent discount upon receipt of Plaintiff's early payment; Plaintiff fully performed the early payment terms.

46. Defendant has breached its original contract and amended contract with PyP.

47. As a direct and proximate result of said breaches, PyP has suffered damages, including but not limited to the payments already made to Defendant and the costs incurred when, as a result of Defendant's breach, Plaintiff was forced to breach its contractual obligations to Smurfit Westbrook. Plaintiff's damages also include interest and attorneys' fees.

48. PyP has demanded that Defendant cure these breaches, but Defendant has failed and/or refused to do so.

## COUNT II
### FRAUD—MATERIAL MISREPRESENTATION

49. PyP repeats and realleges the allegations contained in paragraphs 1 through 42 above as if fully set forth herein.

50. Defendant knew that PyP's client had specific, time-sensitive needs for the equipment to be ready. *See* Ex. 1, 1-2 ("Absolutely understand the importance of delivery and will

do our absolute BEST;" "We are doing our absolute best on delivery . . . ;" "We will all obviously work tirelessly to meet their requested delivery.").

51. Defendant misrepresented the time it would require to complete the purchase order, knowing that suppliers were unreliable and that Emerson could not control the order timeline.

52. PyP reasonably relied on the initial timeline Defendant provided in entering into the contract with Defendant.

53. PyP would not have purchased the equipment from Defendant but for the material misrepresentations made regarding Defendant's ability to adhere to the estimated timeline provided in the initial Agreement.

54. As a direct and proximate result of said reliance, PyP has suffered damages, including but not limited to the payments already made to Defendant and the costs incurred when, as a result of Defendant's misrepresentation of material facts, Plaintiff was forced to breach its contractual obligations to Smurfit Westbrook. Plaintiff's damages also include interest and attorneys' fees.

## COUNT III
### NEGLIGENT MISREPRESENTATION

55. PyP repeats and realleges the allegations contained in paragraphs 1 through 42 above as if fully set forth herein.

56. In the course of their business and in the business transaction described herein, Defendant supplied false information to PyP regarding the estimated timeline for work to be completed, and the causes of the delays, which changed substantially over time.

57. PyP justifiably relied upon Defendant's false information.

58. Defendant failed to exercise reasonable care or competence in obtaining and communicating information regarding timelines and delays.

59. PyP would not have entered into a purchase agreement with Defendant but for Defendant's false information and misrepresentations as to timelines and payment terms.

60. As a direct and proximate result of Defendant's negligent misrepresentation, PyP has suffered damages, including but not limited to the payments already made to Defendant and the costs incurred when, as a result of Defendant's negligent misrepresentation, Plaintiff was forced to breach its contractual obligations to Smurfit Westbrook. Plaintiff's damages also include interest and attorneys' fees.

## COUNT IV
### TORTIOUS INTERFERENCE WITH CONTRACT

61. PyP repeats and realleges the allegations contained in paragraphs 1 through 42 above as if fully set forth herein.

62. Defendant threatened to contact PyP's client directly when it initially heard of the client's dissatisfaction with the services provided.

63. Defendant contacted PyP's client directly on or about April 8, 2025, through a letter explaining its delays.

64. Defendant threatened to contact PyP's client directly on August 19, 2025, if PyP did not make another payment.

65. Such contacts and threats of contact constitute tortious interference with PyP's contract with Smurfit Westrock through intimidation.

66. As a direct and proximate result of Defendant's intimidation of PyP's client, Smurfit Westrock, PyP has suffered damages, including, but not limited to, the payments already made to Defendant and the costs incurred when, as a result of Defendant's tortious interference, PyP was forced to breach its contractual obligations to Smurfit Westbrook. Plaintiff's damages also include interest and attorneys' fees.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff demands judgment as follows:

a. ordering Defendant immediately to ship the remaining equipment;

b. awarding Plaintiff general and/or compensatory damages in an amount to be determined at trial for all injuries suffered as a result of Defendant's wrongdoing;

c. awarding Plaintiff nominal damages;

d. awarding Plaintiff punitive damages;

e. awarding Plaintiff pre-judgment and post-judgment interest at the maximum rate allowable by law;

f. awarding Plaintiff the costs of suit as incurred in this action and attorneys' fees;

g. awarding Plaintiff injunctive relief to prevent Defendant from interfering with Plaintiff's business relationships; and

h. all other relief as may be appropriate.

Respectfully submitted,

JENSEN BAIRD GARDNER & HENRY, P.A.

Dated: December 17, 2025
Portland, Maine

By: /s/ Alfred J. F. Morrow III
Alfred J. F. Morrow
10 Free Street
P.O. Box 4150
Portland, ME 04112-4150
Tel: (207) 775-7271
Email: amorrow@jensenbaird.com

*Attorney for Plaintiff*

## **CERTIFICATE OF SERVICE**

I hereby certify that on December 17, 2025, I electronically filed the foregoing document using the CM/ECF system, which will send notification of such filing to the parties registered with the CM/ECF system.

Dated: December 17, 2025  /s/ Alfred J. F. Morrow III
Alfred J. F. Morrow